Robert Alexander (*pro hac vice* forthcoming)
Andrew K. Waks (*pro hac vice* forthcoming)
**BREDHOFF & KAISER P.L.L.C.**
805 Fifteenth Street, NW, Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Fax: (202) 842-1888
ralexander@bredhoff.com
awaks@bredhoff.com

Peter Dickinson, SBN 139495
Paul Moorhead, SBN 240029
**BUSH GOTTLIEB, ALC**
801 N. Brand Blvd., Suite 950
Glendale, CA 91203
Telephone: (818) 973-3234
Fax: (818) 973-3201
pdickinson@bushgottlieb.com
pmoorhead@bushgottlieb.com

**Attorneys for Plaintiffs**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DIRECTORS GUILD OF AMERICA – PRODUCER PENSION PLANS,** | Case No.: 2:26-cv-07018 |
| **and** | **COMPLAINT** |
| **TRUSTEES OF THE DIRECTORS GUILD OF AMERICA – PRODUCER PENSION PLANS,** | |
| **Plaintiffs,** | |
| **vs.** | |
| **METRO-GOLDWYN-MAYER PICTURES, INC.,** | |
| **Defendant.** | |

Nature of the Case

1.    In 2008, Defendant Metro-Goldwyn-Mayer ("MGM" or "Defendant"), along with two other movie studios, created a pay television service they named Epix. In 2017, MGM bought out the other studios' interests in Epix, owning it

1
COMPLAINT

alone until it renamed the service MGM+ in 2023. Shortly after establishing Epix, MGM entered into distribution licenses with it at artificially low rates, reflecting the fact that the parties were not negotiating at arm's length. These licenses allowed Epix to exhibit movies and television shows licensed to it by MGM to Epix subscribers, both at set times and on demand, and further allowed Epix to subdistribute MGM-produced materials to other streaming services, including Netflix, Hulu, Paramount+, and Amazon.

2. By entering into this sweetheart distribution license arrangement with Epix, MGM was able to report artificially low license revenue to the Directors Guild of America ("DGA"), the union representing employees responsible for creating MGM's movies and television shows, as well as to the Plaintiff Directors Guild of America - Producer Basic Pension Plan ("Pension Plan"), the benefit fund responsible for providing the DGA-represented employees their pension benefits, and as to which MGM has pension contribution obligations as a participating employer. The Pension Plan only learned that MGM had used its self-dealing arrangement with Epix to shirk its pension contributions years after the Pension Plan received MGM's understated contributions, and the Pension Plan still has not received information that would reveal the full scope of the underpayments.

3. This is an action for declaratory relief, injunctive relief, as well as for statutory and contract damages, and seeks an order requiring the Defendant to furnish information to the Pension Plan to allow it to obtain and audit the records necessary to determine the extent to which Defendant has breached its obligations to make all contribution payments to the Plan, and to pay delinquent contributions owed to the Pension Plan arising from Defendant's self-dealing distribution licensing scheme.

4. This action is brought pursuant to the Employee Retirement Income Security Act, as amended, 29 U.S.C. §§ 1001, et seq. (hereinafter "ERISA"), and §

301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185(a) (hereinafter "LMRA").

## Jurisdiction and Venue

5.　The Court has jurisdiction of this action under the terms of 29 U.S.C. § 1132, 29 U.S.C. § 185(a), and 28 U.S.C. § 1331.

6.　Venue is proper in this district pursuant to both 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2) because this is the district in which the Defendant resides and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## Parties and Related Entities

7.　The Pension Plan is an employee benefit plan established and maintained pursuant to Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5). Plaintiff Pension Plan is an employee pension benefit plan within the meaning of Sections 3(2) and 3(3) of ERISA, 29 U.S.C. §§ 1002(2) and (3), and is maintained for the purpose of providing retirement and related benefits to over 25,000 eligible participants and beneficiaries. Plaintiff Pension Plan is also a multiemployer pension plan within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).

8.　Plaintiff Trustees of the Pension Plan ("Trustees") are appointed by the employers and the DGA pursuant to the terms of the Pension Plan Trust Agreement and LMRA § 302. Trustees are jointly responsible for administering the Pension Plan and are fiduciaries within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

9.　Plaintiffs maintain their principal place of business at 5055 Wilshire Blvd, in Los Angeles, California.

10.　Plaintiffs bring this action on behalf of the Pension Plan and on behalf of Pension Plan participants and beneficiaries pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), and Section 301 of the LMRA, 29 U.S.C. § 185.

COMPLAINT

11.    Defendant MGM is a Delaware corporation and an employer in an industry affecting commerce within the meaning of Sections 3(5), 3(11), and 3(12) of ERISA, 29 U.S.C. §§ 1002(5), (11) and (12), and Sections 2(2), 2(6) and 2(7) of the LMRA, 29 U.S.C. §§ 152(2), (6) and (7).

12.    Defendant does business and resides in the state of California. Its principal place of business is 9300 Culver Blvd, Culver City, California. That location is within this judicial district.

13.    The Directors Guild of America ("DGA") is an "employee organization" under ERISA § 2(4), 29 U.S.C. § 1002(4), and a "labor organization" under LMRA § 2(5), 29 U.S.C. § 152(5). The DGA represents motion picture directors, unit production managers, assistant directors, associate directors, stage managers, and production associates (collectively, "covered employees") in dealing with employers in the motion picture industry. The DGA has a principal place of business in Los Angeles, California.

14.    Epix was a pay television company created in 2008 by MGM, Paramount/Viacom, and Lionsgate Studios. Epix exhibited content to its subscribers licensed to it by, *inter alia*, the three studios that created it, both on a predetermined schedule set by Epix, and also in a user-determined on-demand format through its streaming service. In 2017, MGM bought out Lionsgate's and Paramount/Viacom's interests in Epix for approximately one billion dollars and continued to operate the pay television and on-demand streaming service as an exhibitor of licensed MGM content until 2023, when Defendant rebranded Epix as "MGM+."

STATEMENT OF THE CLAIMS

*The Basic Agreements*

15.    MGM is a motion picture studio that produces movies and television programs (together "motion pictures"), which it exhibits through distribution licenses in various formats and media.

4
COMPLAINT

16. For periods prior to 2008 through the present, MGM was party to a series of industry-wide collective-bargaining agreements with the DGA, referred to as "Basic Agreements," for production of motion pictures.

17. The Basic Agreements include and incorporate a series of sideletter agreements, including, as relevant here, Sideletter 15. Sideletter 15, first entered into in 2002, has been updated by the parties multiple times.

18. The Basic Agreements are contracts between an employer and a labor organization within the meaning of Section 301 of the LMRA, 29 U.S.C. § 185.

19. MGM and the DGA remained bound by the terms of the Basic Agreements governing pension contributions during all periods relevant to this action.

20. Each of the Basic Agreements requires Defendant to make payments to the Pension Fund for the purposes of providing pensions to employees working in the bargaining unit represented by the DGA, and for defraying the Pension Plan's administrative costs. These required payments are "contributions" under ERISA section 515, 29 U.S.C. § 1145.

21. Each of the Basic Agreements requires signatory employers, including Defendant, to make pension contributions to the Pension Plan. Employers' contribution obligations are a percentage of both the wages paid to individual employees and on the employers' revenue from various forms of commercial exploitation of motion pictures covered by the Basic Agreement.

22. Each of the Basic Agreements further provides that Defendant agrees to accept and be bound by the provisions of the Pension Plan Trust Agreement. The provisions of the Trust Agreement are "terms of the plan" within the meaning of Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), and the "terms and conditions of such plan" within the meaning of Section 515 of ERISA, 29 U.S.C. § 1145.

23. The Pension Plan's Trust Agreement provides that an employer who fails to pay required contributions to the Pension Plan is liable to the Pension Plan

not only for the delinquent contributions, but also for the greater of interest (at a rate set by the Plan Trustees or the Legal and Delinquency Committee) or liquidated damages.

24. Under the Trust Agreement, for delinquencies of more than 60 days, liquidated damages equal 20 percent of the delinquent contribution amount.

25. The Trust Agreement further provides that, in the event an action or proceeding is commenced against an employer to recover delinquent contributions, the employer is liable for *both* interest on delinquent contributions and the greater of 20% liquidated damages or accrued interest, in addition to reasonable attorneys' fees and costs, and all other relief provided by law or equity.

26. The Trust Agreement requires employers, including Defendant, to make such reports and statements to the Plan Trustees with respect to the amount and calculation of any and all contributions remitted (or required to be remitted) to the Pension Fund as the Plan Trustees may deem necessary or desirable.

27. The Trust Agreement further provides that the Pension Plan's representatives may audit or cause the audit or inspection of the records of any employer, including Defendant, which may be pertinent in connection with the contributions and/or reports described in Paragraph 26, insofar as the same may be necessary to accomplish the purpose of the Pension Plan. If any such audit or inspection discloses a delinquency, the Trust Agreement provides that the cost of the audit or inspection shall be borne by the employer. If attorneys' fees are expended to compel such an audit or inspection or to collect amounts outstanding from an employer, the employer is required to pay attorneys' fees, the costs of the audit or inspection, interest penalties or liquidated damages, and court costs incurred by the Trustees in connection with any necessary litigation.

*Supplemental Market/New Media Contributions and Licensing to Related or Affiliated Entities*

28.     Apart from exhibiting its motion pictures in theaters and on free television, MGM has licensed its motion pictures for distribution in other media, including through exhibition on pay television, through videotape and DVD media (referred to in the Basic Agreement as "Supplemental Markets"), and, more recently, through streaming on the internet, mobile devices, and other platforms (such streaming-based distribution platforms are collectively referred to by the parties as "New Media").

29.     In connection with MGM's licensing a motion picture for distribution and exhibition in Supplemental Markets and New Media, Defendant is required by the Basic Agreements to report and pay over a portion of its revenue attributable to such licensing to the covered employees working on the motion picture as additional compensation, and to pay over a portion to the Pension Plan as additional contributions. The revenue related to Defendant's distribution of motion pictures in Supplemental Markets and New Media is referred to as the "Employer's gross."

30.     Under the terms of the Basic Agreement, including Sideletter 15, Defendant is and has been obligated to share 1.2% of the Employer's gross from distributing a motion picture in New Media and Supplemental Markets as "additional compensation." Of the 1.2% of the Employer's gross for a motion picture, one-third (or 0.4% of the Employer's gross) is to be paid to the Pension Plan as Pension Plan contributions, with the remainder to be paid to the motion picture's director and in most instances to certain other employees covered by the Basic Agreement who worked on the motion picture.

31.     Under the definition of "Employer's gross" applicable to Supplemental Markets and New Media, set forth in Paragraph 18-103(b) of the Basic Agreement, when Defendant does not distribute the motion picture directly, but rather employs a subdistributor to distribute the motion picture, the "Employer's gross" shall

include the "worldwide total receipts derived by such subdistributor from licensing the right to exhibit the motion picture[.]"

32.    In addition, under Sideletter 15, at least since 2008, when the Defendant's Employer's gross "derived from New Media . . . exploitation is received from a related or affiliated entity that acts as the exhibitor/retailer of such Picture," then the "Employer's gross received by the [Defendant] from the licensing of such rights shall be measured by the exhibitor/retailer's payments to unrelated and unaffiliated entities in arms' length transactions for comparable pictures, or, if none, then the amounts received by the Employer from unrelated and unaffiliated exhibitors/retailers in arms' length transactions for comparable pictures, or, if none, a comparable exhibitor/retailer's payments to comparable unrelated and unaffiliated entities in arms' length transactions for comparable pictures."

33.    The Basic Agreements and the Trust Agreement require that each quarter MGM must report the Employer's gross receipts in Supplemental Markets and New Media for each such licensed motion picture and pay to the Pension Plan its one-third share of the 1.2% of the Employer's gross as Pension Plan contributions.

34.    Under the terms of the Basic Agreement, including Sideletter 15, Defendant is and has been obligated to furnish reports to the DGA showing the Employer's gross for each motion picture exhibited in Supplemental Markets and New Media with respect to which the Defendant is required to make supplemental compensation payments, and to do so within a reasonable time, not exceeding 60 days, after each fiscal or calendar quarter. Concurrently with providing the reports referenced above, Defendant is required to make its pension contributions due to the Pension Plan from the Employer's gross for each such motion picture.

*MGM Supplemental Market and New Media Licensing, MGM-Epix SVOD*

*Licensing*

35.     For decades, MGM has made contributions to the Pension Plan in connection with revenue received from distributing its motion pictures in Supplemental Markets. On information and belief, until about 15-20 years ago, the bulk of MGM's revenue in Supplemental Markets (apart from revenue obtained from videotape and DVD licensing) was derived from licensing its motion pictures in the pay television model, such as HBO, Cinemax, and Showtime. The original pay television model market allowed consumers to purchase defined period subscriptions for "premium channels" and view content, including content licensed by Defendant, at predetermined times on the schedule set by the pay television service, similar to the manner in which broadcast television is made available to view. This viewing model is known in the industry as a "linear" distribution model. In a linear platform, the subscriber could view the motion picture or program on the schedule set by the pay television service, but could not select the motion picture or program to be viewed at any time the subscriber wanted.

36.     Over time, technological developments allowed pay television and New Media services, such as Netflix, to exhibit content in an on-demand streaming format. In this format, the subscriber could select any available licensed material to be viewed at any time they chose. This consumption model is known as "Subscription Video On Demand" or "SVOD."

37.     The SVOD format for exhibiting content provided motion picture producers, including MGM, additional valuable licensing opportunities to distribute their motion pictures over the internet or through other media in streaming formats.

38.     Prior to the creation of Epix, Defendant entered into a licensing agreement with Showtime Networks (hereinafter, "Showtime") permitting Showtime to exhibit Defendant's theatrical "output"—that is, the motion pictures Defendant released in theaters during the term of the Showtime license—on

Showtime's pay television services. That licensing agreement did not provide Showtime with the right to subdistribute Defendant's motion pictures to other exhibitors. Other studios, including Paramount Pictures and Lionsgate, also licensed their theatrical output to Showtime during the same time frame.

39.	In or around 2008, each of Defendant, Paramount Pictures, and Lionsgate were engaged in individual negotiations with Showtime to renew their output licensing agreements. However, instead of renewing their licenses with Showtime, Defendant, Paramount, and Lionsgate formed their own pay television service, Epix, which launched to the public in 2009.

40.	Since Epix launched, MGM has licensed its motion pictures to Epix for exhibition via pay television and SVOD.

41.	In 2017, Defendant bought out Paramount's and Lionsgate's interests in Epix for just over $1 billion, thereby becoming the sole owner of Epix.

42.	Following Defendant's buyout of Epix, it continued to license its motion pictures to Epix for exhibition via pay television and SVOD, including over the Internet.

43.	In January 2023, Epix was rebranded as MGM+.

*The Pension Plan's MGM Supplemental Market Audits and Discovery of the MGM-Epix Self-Dealing Licensing Relationship*

44.	Pursuant to its rights under the Basic Agreement and the Pension Plan Trust Agreement, the Pension Plan, through its representatives, conducts audits of Defendant on a regular basis to determine whether Defendant has made all contributions it owes to the Pension Plan in accordance with the terms of the relevant Basic Agreements.

45.	The Pension Plan has engaged a residuals auditor, Nigro Karlin Segal and Feldstein, LLP ("NKSF"), to conduct regular periodic audits of Defendant's contributions to the Plan.

COMPLAINT

46.     As relevant here, NKSF conducted three audits of Defendant that began in 2014, 2017, and 2021. Those audits covered, respectively, the periods from April 1, 2010, to September 30, 2013; October 1, 2013, to September 30, 2017; and October 1, 2017, to June 30, 2022.

47.     The final 2010-2013 audit report was submitted to the Pension Plan on August 29, 2017; the final 2013-2017 audit report was submitted to the Pension Plan on May 12, 2021; and the final 2017-2022 audit report was submitted to the Pension Plan on February 5, 2026. In each instance, the Pension Plan shared the audit results with Defendant.

48.     In fall 2016—while performing the Pension Plan's 2010-2013 audit— NKSF learned from public sources that Defendant's motion pictures had been licensed not only to Epix, but also to other SVOD services including Netflix, Amazon, Paramount+, and Hulu.

49.     Around the same time, NKSF learned that some or all of Defendant's licensing deals with Epix included the right for Epix to subdistribute, subject to Defendant's advance written agreement, MGM's motion pictures to other SVOD services. On information and belief, Epix (and later MGM+) have exercised that right by entering into subdistribution deals with other SVOD platforms with Defendant's advance written approval.

50.     During its 2010-2013 period audit, NKSF also learned that the Epix licensing payment obligations to Defendant were lower than those in licenses Defendant had previously negotiated with Showtime for pay television rights, notwithstanding that Defendant had granted Epix the additional and extremely valuable SVOD subdistribution rights for no additional consideration.

51.     On or around September 22, 2016, NKSF requested documentation to determine whether contributions paid to the Pension Plan on account of MGM's Employer's gross properly valued the rights MGM granted to Epix, and whether the

contributions accounted for subdistribution revenue Epix obtained from licensing Defendant's motion pictures to other SVOD services.

52. During subsequent audits, NKSF again requested, on or around April 3, 2018, and on or around January 23, 2023, similar documentation to determine whether contributions paid to the Pension Plan on account of MGM's Employer's gross properly valued the rights MGM granted Epix in those audit periods, and whether the contributions accounted for subdistribution revenue Epix obtained from licensing the motion pictures to other SVOD services during those audit periods.

53. Defendant reports its receipts from the licensing of its motion pictures in Supplemental Markets and New Media (including in SVOD) on a quarterly basis in a document that identifies only the total receipts received for each motion picture. The quarterly reports do not, however, provide the information required to determine whether Defendant has properly represented its Employer's gross for each such motion picture on which contributions are made under the Basic Agreement and Sideletter 15.

54. Notwithstanding NKSF's requests for additional documentation, Defendant has refused to provide information sufficient to enable NKSF or the Pension Plan to determine the true Employer's gross as to which contributions are due, given the nature of Epix's SVOD licensing rights, and Epix's subdistribution of Defendant's motion pictures to other SVOD services.

55. On information and belief, Defendant has, since the beginning of the MGM-Epix license relationship, failed to report or pay contributions representing the value of the SVOD and subdistribution rights MGM granted Epix and MGM+.

56. In each audit report, NKSF noted that MGM was unwilling to provide it the necessary documentation to identify Supplemental Market and New Media transactions potentially precipitating additional contribution obligations, or to provide the information necessary for NKSF to ascertain the magnitude of any contribution underpayment. As such, NKSF and the Pension Plan have treated such

COMPLAINT

disputes as unresolved or "Open Issues," and the amounts owed in additional contributions as "Undetermined."

*Tolling of Claims Arising From 2010-2013, 2013-2017, 2017-2022 Audit Periods*

57. Although the Pension Plan and its auditors continued to press MGM for records that would identify the motion pictures licensed to Epix for the 2010-2013, 2013-2017, and 2017-2022 audit periods, as well as the records from which the Pension Plan and its auditors could determine whether the Employer's gross was undervalued under the terms of the Basic Agreements and Sideletter 15, MGM continued to refuse to provide the documents, stating that disputes related to the MGM-Epix licensing arrangements "are being handled separately from resolution of other issues."

58. MGM's statement that the Epix claims "are being handled separately" referred to MGM's and the DGA's discussions and, ultimately, arbitration proceedings to resolve the DGA's concerns regarding the proper accounting of the Employer's gross in connection with the MGM-Epix licensing arrangement directly under the terms of the Basic Agreements, including Sideletter 15.

59. Accordingly, the Pension Plan agreed to put off resolution of its concerns pending MGM's and the DGA's discussions that ultimately resulted in arbitration proceedings between the DGA and MGM. At the same time, MGM continued to refuse to provide the Pension Plan with documents necessary to determine whether the licensing to Epix of any particular motion picture during the audit periods created a claim for additional pension contributions, let alone the amount of any underpayment that might have accrued.

60. The Pension Plan is not a party to the DGA-MGM arbitration and is not privy to its confidential proceedings.

61. Consistent with the parties' past practice in dealing with disputes over benefit contribution obligations under the Basic Agreements that are ancillary to employer residual or additional compensation obligations to the DGA for

employees covered by the Basic Agreement, the Pension Plan agreed with MGM to enter into agreements to toll potential Pension Plan claims arising out of underreported Employer's gross related to the MGM-Epix licensing arrangement.

62. With respect to MGM-Epix Open Issues identified by NKSF arising in the 2010-2013 and 2013-2017 audit periods, Defendant and the Pension Plan have entered into a series of tolling agreements, the latest of which are open-ended and continue to toll "the statute of limitations[] and any other time bar" regarding the Open Issues indefinitely, with termination requiring a 30-day written notice. To date, neither party has sought to terminate the 2010-2013 or 2013-2017 audit period tolling agreements.

63. Defendant and the Pension Plan also entered into a 12-month tolling agreement regarding the 2017-2022 audit period on December 8, 2021 (prior to the end of the audit period itself), stating that "[i]n order for the audit process to be completed," the parties agreed that "the statute of limitations period, and any other time bar, shall be tolled" until the termination of the agreement on December 7, 2022. Subsequently, the Pension Plan and Defendant entered into two materially identical tolling agreements covering all periods until December 7, 2024. More recently, however, Defendant has refused to renew the tolling agreement for periods after December 7, 2024, to encompass all claims regarding the MGM-Epix Open Issues considered by NKSF arising in the 2017-2022 audit period.

64. As a result of Defendant's refusal to renew a tolling agreement to cover all such claims, the Pension Plan has brought this suit to protect its rights under ERISA and the LMRA.

COUNT ONE

(Failure to Comply With Audit Obligations—by all Plaintiffs)

65. Plaintiffs re-allege and incorporate by reference Paragraphs 1-64.

66. Under the Basic Agreements Defendant has for all relevant periods agreed to be bound by the terms and Provisions of the Trust Agreement, including

14

COMPLAINT

to comply with the obligations to permit audits and inspections of documents relevant to Defendant's Supplemental Market and New Media contribution obligations.

67.    Notwithstanding repeated requests by the Pension Plan's auditors for documents necessary to determine whether Defendant, for the 2010-2013, 2013-2017, and 2017-2022 audit periods, has properly made Pension Plan contributions on Defendant's Employer's gross for motion pictures licensed during the audit periods by MGM to Epix for distribution and exhibition in Supplemental Markets and New Media, Defendant has refused to provide such information.

68.    Defendant's failure to provide records necessary to determine whether motion pictures produced by MGM and licensed during the audit periods reflected the proper measure of Employer's gross, makes it impossible for the Pension Plan or its representatives to determine contribution delinquencies with respect to SVOD licensing of Defendant's motion pictures to or through Epix.

69.    Defendant's failure and refusal to comply with its audit obligations as related to the 2010-2013, 2013-2017, and 2017-2022 Supplemental Market Inspection audits of Defendant, as set out above in Paragraphs 26-27, 56-57 constitute breaches of its obligations under the Basic Agreements and under the Trust Agreement. The Pension Plan and the Trustees are authorized to bring this claim to redress such breaches of the Basic Agreements and Trust Agreement under Section 301 of the LMRA, 29 U.S.C. § 185(a), and Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

70.    Under the Basic Agreements and the Trust Agreement, Defendant also is liable for attorneys' fees, court costs, interest, liquidated damages, and auditing costs in connection enforcing delinquent contribution obligations to the Pension Plan.

71.    Under Section 301 of the LMRA, 29 U.S.C. § 185(a), and Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1), Plaintiffs are entitled to enforce their

right to conduct a complete audit of Defendant's records, to reasonable attorneys' fees and costs of this action, and to the additional audit costs that will be necessary because of Defendant's breach of its obligations under the collective-bargaining agreements and under the Trust Agreement.

## COUNT TWO

### (Breach of Contribution Obligations—By Plaintiff Pension Plan)

72.   Plaintiffs re-allege and incorporate by reference Paragraphs 1-71.

73.   Under the Basic Agreements, including Sideletter 15, Defendant is required to pay the Pension Plan 0.4% of the Employer's gross of pay television, SVOD, and other distribution licensing amounts with respect to each motion picture produced by MGM and licensed in Supplemental Markets or New Media.

74.   Defendant's licensing of pay television and SVOD distribution rights to Epix for motion pictures produced from April 1, 2010, to January 15, 2023, constitute transactions with a "related or affiliated entity."

75.   Defendant's licensing of SVOD distribution rights to MGM+ for motion pictures produced since January 15, 2023, constitute transactions with a "related or affiliated entity."

76.   Defendant's Employer's gross derived from New Media licensing transactions with Epix and MGM+ is subject to Sideletter 15 and should be measured by reference to licensing transactions between unrelated and unaffiliated parties, in accordance with the standard set out above in Paragraph 33.

77.   On information and belief, Defendant's reporting of the Employer's gross for motion pictures it licensed to Epix and to MGM+ understates the appropriate arms-length measurement of the value of the motion picture license payment obligations for distributing Defendant's motion pictures for exhibition in pay television and SVOD.

78.   Pursuant to the Basic Agreement, including Sideletter 15, when the Defendant does not conduct all the distribution of its motion pictures directly in

Supplemental Markets and New Media, including the SVOD market, but rather employs a subdistributor to distribute the motion pictures, then the Defendant's Employer's gross should include the worldwide total gross receipts derived by the subdistributor.

79.   On information and belief, Epix acted as a subdistributor of Defendant's motion pictures, and subdistributed Defendant's motion pictures produced since April 1, 2010, to other SVOD platforms, including Netflix, Hulu, Paramount+, and Amazon, and received substantial revenues for licensing the motion picture SVOD exhibition rights.

80.   The SVOD subdistribution revenues obtained by Epix from subdistributing Defendant's motion pictures to third-party SVOD platforms have not been included in the Employer's gross reported by Defendant to the Pension Plan.

81.   Although Defendant has refused to provide the Pension Plan documents and records from which the Pension Plan could make a determination of the correctness of Defendant's Supplemental Market and New Media payments with respect to motion pictures MGM has licensed to Epix, on information and belief, the self-dealing transactions between Defendant on the one hand, and Epix and MGM+ on the other, substantially understated the proper measurement of the Employer's gross on which contributions are due.

82.   On information and belief, Defendant's artificially understated Employer's gross with respect to motion pictures Defendant licensed since April 1, 2010, to Epix and, since January 15, 2023, to MGM+ has resulted in Defendant underpaying the Pension Plan the full amounts of contributions owed it. Because Defendant has refused to provide the Pension Plan and its auditors records reflecting the transactions by Epix necessary to confirm the proper measurement of the Employer's gross for each motion picture on which Defendant owes

contributions, the Pension Plan is unaware of when underpayments may have accrued, and the extent of underpayments.

83.    The underpayments, in amounts to be proven at trial, constitute a breach of Defendant's obligations under the Basic Agreements and the Trust Agreement. The breaches have injured the Pension Plan and the participants and beneficiaries for whom it is obligated to provide pension benefits.

84.    The Pension Plan is an intended third-party beneficiary of the Basic Agreements, including Sideletter 15, and is expressly permitted to assert its rights under the Basic Agreements.

85.    The Pension Plan is entitled to redress that breach of the Basic Agreement, including Sideletter 15, under Section 301 of the LMRA, 29 U.S.C. § 185(a).

86.    Under the terms of the Basic Agreement, including provisions extending time limits to the same extent as provided by California statutes of limitations, and by the Tolling Agreements related to the 2010-2013, 2013-2017, and 2017-2022 time periods described in Paragraphs 57-64 above, the time to assert claims under LMRA § 301 has not expired as to any underpayment, known or unknown.

## COUNT THREE

### (Breach of Contribution Obligation—By Plaintiff Trustees)

87.    Plaintiffs re-allege and incorporate by reference Paragraphs 1-86.

88.    Defendant is obligated to make pension contributions to the Pension Plan consistent with the terms of the Basic Agreements and the Trust Agreement.

89.    Under the Basic Agreements, including Sideletter 15, Defendant is required to pay Pension Plan contributions of 0.4% of the Employer's gross of pay television, SVOD, and other distribution licensing amounts with respect to each motion picture produced by MGM and licensed in Supplemental Markets or New Media.

18
COMPLAINT

90.   Defendant's licensing of pay television and SVOD distribution rights to Epix for motion pictures produced from April 1, 2010, to January 15, 2023, constitute transactions with a "related or affiliated entity."

91.   Defendant's licensing of pay television and SVOD distribution rights to MGM+ for motion pictures produced since January 15, 2023, constitute transactions with a "related or affiliated entity."

92.   Defendant's Employer's gross derived from New Media licensing transactions with Epix and MGM+ is subject to Sideletter 15 and should be measured by reference to licensing transactions between unrelated and unaffiliated parties, in accordance with the standard set out above in Paragraph 32.

93.   On information and belief, Defendant's reporting of the Employer's gross for motion pictures it licensed to Epix and to MGM+ understates the appropriate arms-length measurement of the value of the motion picture license payment obligations for distributing Defendant's motion pictures for exhibition in pay television and SVOD.

94.   Pursuant to the Basic Agreement, including Sideletter 15, when the Defendant does not conduct all the distribution of its motion pictures directly in Supplemental Markets and New Media, including the SVOD market, but rather employs a subdistributor to distribute the motion pictures, then the Defendant's Employer's gross should include the worldwide total gross receipts derived by the subdistributor.

95.   On information and belief, Epix acted as a subdistributor of Defendant's motion pictures, and subdistributed Defendant's motion pictures produced since April 1, 2010, to other SVOD platforms, including Netflix, Hulu, Paramount+, and Amazon, and received substantial revenues for licensing the motion picture SVOD exhibition rights.

96.   The SVOD subdistribution revenues obtained by Epix from subdistributing Defendant's motion pictures to third-party SVOD platforms have

not been included in the Employer's gross reported by Defendant to the Pension Plan.

97. Although Defendant has refused to provide the Pension Plan documents and records from which the Pension Plan could make a determination of the correctness of Defendant's Supplemental Market and New Media payments with respect to motion pictures MGM has licensed to Epix, on information and belief, the self-dealing transactions between Defendant on the one hand, and Epix and MGM+ on the other, substantially understated the proper measurement of the Employer's gross on which contributions are due.

98. On information and belief, Defendant's artificially understated Employer's gross with respect to motion pictures Defendant licensed since April 1, 2010, to Epix and, since January 15, 2023, to MGM+ has resulted in Defendant underpaying the Pension Plan the full amounts of contributions owed it. Because Defendant has refused to provide the Pension Plan and its auditors records reflecting the transactions by Epix necessary to confirm the proper measurement of the Employer's gross on which Defendant owes contributions, the Pension Plan is unaware of when underpayments may have accrued, and the extent of underpayments.

99. The underpayments, in amounts to be proven at trial, constitute violations of Defendant's pension contribution obligations under the Basic Agreements and the Trust Agreement. The Trustees are empowered to assert claims to recover such contribution for the Pension Plan and for the participants and beneficiaries for whom the Pension Plan provides pension benefits.

100. Under ERISA § 515, 29 U.S.C. § 1145, and ERISA § 502(g)(2), 29 U.S.C. § 1132(g)(2), Defendant is liable to the Pension Plan to pay the full amount of its delinquent contributions as determined in these proceedings, plus interest, liquidated damages, attorneys' fees, and costs of this action.

COMPLAINT

## COUNT FOUR

### (Breach of Contribution Obligation for the 2017-2022 Supplemental Market Audit Liquidated Claims—By All Plaintiffs)

101.   Plaintiffs re-allege and incorporate by reference Paragraphs 1-100.

102.   In addition to the Open Items discussed above, NKSF also identified in its February 5, 2026, audit report an additional $540,426 of unpaid contributions owed to the Pension Plan (excluding interest) for the 2017-2022 audit period, unrelated to Defendant's failure to make proper Pension Plan contributions on Defendant's Employer's gross for motion pictures licensed during the audit periods by MGM to Epix for distribution and exhibition in Supplemental Markets and New Media. As of June 23, 2026, additional Open Items remain outstanding, and additional audit work may disclose additional delinquent contributions beyond the quantified amounts set out above.

103.   The claims for these unpaid contributions are timely under the terms of the Basic Agreements and the tolling agreements relating to the 2017-2022 audit period, described in Paragraph 63 above.

104.   By letter dated February 12, 2026, the Pension Plan has demanded that MGM pay the delinquent Pension Plan contributions, but to date MGM has refused.

105.   Pursuant to the Basic Agreements in effect between MGM and the DGA since October 1, 2017, the Trust Agreement, Section 301 of the LMRA, 29 U.S.C. § 185(a), and Sections 502(a)(3), (g), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), (g), 1145, Defendant is liable to the Pension Plan for all unpaid contributions, plus liquidated damages, attorneys' fees, and costs of this action.

///

///

///

///

///

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Defendant's failure and refusal to provide the records that have been determined by the Pension Plan's representatives to be necessary for complete audits of Defendant's Supplemental Markets contribution obligation to the Pension Plan violates Defendant's obligations under the Basic Agreements and the Trust Agreement;

B.    Order Defendant to produce all records reasonably requested by the Pension Plan's auditors for the purpose of completing audits of Defendant's obligations to make Supplemental Market and New Media contributions to the Pension Plan for the time period of April 1, 2010, through the present;

C.    Award a judgment in the full amount of the delinquent Supplemental Market and New Media contributions Defendant owes to the Pension Plan for the period from April 1, 2010, through the present, together with interest and liquidated damages, as required by the Basic Agreements, the Trust Agreement, and by ERISA Section 502(g)(2), 29 U.S.C. § 1132(g)(2);

D.    Award plaintiffs reasonable attorneys' fees and costs incurred in this action pursuant to the Trust Agreement and Sections 502(g)(1), and (2) of ERISA, 29 U.S.C. § 1132(g)(1), and (2); and

E.    Order such other legal and equitable relief as the Court may deem just and appropriate.

///

///

///

///

///

///

///

22
COMPLAINT

Plaintiffs demand a trial by jury on all claims so triable.

Dated: June 26, 2026

Robert Alexander*
Andrew K. Waks*
**BREDHOFF & KAISER, P.L.L.C.**
805 Fifteenth Street NW Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Fax: (202) 842-1888
ralexander@bredhoff.com
awaks@bredhoff.com

Attorneys for Plaintiffs
* *Pro Hac Vice* forthcoming

Peter Dickinson, SBN 139495
Paul Moorhead, SBN 240029
**BUSH GOTTLIEB**
801 N. Brand Blvd., Suite 950
Glendale, CA 91203
Telephone: (818) 973-3234
Fax: (818) 973-3201
pdickinson@bushgottlieb.com
pmoorhead@bushgottlieb.com

A copy of this Complaint will be served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, as required by ERISA Section 502(h), 29 U.S.C. § 1132(h).